**FORTE, DUPEE, SAWYER CO., a DIVISION OF FORTE FAIRBAIRN, Inc.**

**v.**

**UNITED STATES (Pistorino & Co., a/c J. J. O'Donnell Woolens, Inc., Party in Interest).**

**C.D. 2631; Protest No. 63/22856–18115.**

United States Customs Court,
First Division.

March 21, 1966.

Sharretts, Paley & Carter, New York City (Eugene F. Blauvelt, New York City, and Alan L. Lefkowitz, Boston, Mass., of counsel), for plaintiff.

John W. Douglas, Asst. Atty. Gen. (Mollie Strum, New York City, Trial Atty.), for defendant.

Brooks & Brooks, New York City (Thomas J. McKenna, New York City, of counsel), for party in interest.

John D. Rode, New York City, amicus curiae.

Before OLIVER and WILSON, Judges.

WILSON, Judge:

The merchandise covered by this protest is cashmere goat fibers. The imported material was classified under the provisions of paragraph 1105(a) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as noils, uncarbonized, and assessed with duty at the rate of 12 cents per pound. The plaintiff contends that

the imported product is properly classifiable under the provisions of paragraph 1106 of the Tariff Act of 1930, as modified by T.D. 51802 and T.D. 52739, at the rate of 27¾ cents per pound and 6¼ per centum ad valorem, as hair of the Cashmere goat advanced beyond the washed or scoured condition and not further advanced than roving. The statutes involved read as follows:

Paragraph 1105(a) and (b) of the Tariff Act of 1930 before modification by the General Agreement on Tariffs and Trade, T.D. 51802:

Par. 1105. (a) Top waste, slubbing waste, roving waste, and ring waste, 37 cents per pound; garnetted waste, 26 cents per pound; noils, carbonized, 30 cents per pound; noils, not carbonized, 23 cents per pound; thread or yarn waste, 25 cents per pound; card or burr waste, carbonized, 23 cents per pound; not carbonized, 16 cents per pound; all other wool wastes not specially provided for, 24 cents per pound; shoddy, and wool extract, 24 cents per pound; mungo, 10 cents per pound; wool rags, 18 cents per pound; flocks, 8 cents per pound.

(b) Wastes of the hair of the Angora goat, Cashmere goat, alpaca, and other like animals, shall be dutiable at the rates provided for similar types of wool wastes.

Paragraph 1105(a) and (b) of the act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802:

Wool and hair wastes:
  Top waste, slubbing waste, roving waste, and ring
    waste .........................................28¢ per lb.
  Garnetted waste ..............................14½¢ per lb.
  Noils, carbonized .................................17¢ per lb.
  Noils, not carbonized ...........................12¢ per lb.
  Thread or yarn waste ...........................11½¢ per lb.
  Card or burr waste, carbonized ...................14½¢ per lb.
  Card or burr waste, not carbonized .................10½¢ per lb.
  Wool wastes not specially provided for ..............10½¢ per lb.
  Shoddy, and wool extract ........................14¢ per lb.
  Mungo .......................................... 9¢ per lb.
  Wool rags ...................................... 9¢ per lb.
  Flocks ........................................ 3½¢ per lb.

Paragraph 1105(a) and (b) of the act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739:

Wool and hair wastes:
  Garnetted waste ................................12½¢ per lb.
  Noils, carbonized ..............................16¢ per lb.
  Thread or yarn waste ...........................10¢ per lb.
  Card or burr waste, not carbonized ................ 9¢ per lb.
  Wool wastes not specially provided for .............. 9¢ per lb.

Paragraph 1106 as originally enacted, Tariff Act of 1930, as it relates to paragraph 1105:

Par. 1106. Wool, and hair of the kinds provided for in this schedule, if carbonized, or advanced in any manner or by any process of manufacture beyond the washed or scoured condition, including tops, but not further advanced than roving, 37 cents per pound and 20 per centum ad valorem.

Paragraph 1106 of the act as modified by the General Agreement on Tariffs and Trade, T.D. 51802:

Wool, and hair of the kinds provided for in Schedule 11, Tariff Act of 1930, if carbonized, or advanced in any manner or by any process of manufacture beyond the washed or scoured condition, including tops, but not further advanced than roving:

Carbonized only ............................27¾¢ per lb.
and
6¼¢ ad val.

Other ...................................27¾¢ per lb.
and
12½% ad val.

———◆———

Paragraph 1106 of the act as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739:

Wool, and hair of the kinds provided for in schedule 11, Tariff Act of 1930, if carbonized, or advanced in any manner or by any process of manufacture beyond the washed or scoured condition, including tops, but not further advanced than roving:

Other than carbonized only ...................27¾¢ per lb.
and
6¼% ad val.

NOTE: The specific parts of the foregoing rate and of the rates in items 1107, 1109(a), 1109(b), 1111, 1114(d), and 1119 in this Part shall be subject to the note in item 1102(b) in Part I of Schedule XX (original).

———◆———

The preliminary inquiry as to plaintiff's legal eligibility to appear in this action requires but brief consideration.

■ Plaintiff's collective exhibit 1 consists of a number of documents which the plaintiff claims are sufficient to establish its right under section 516(b) of the Tariff Act of 1930 to appear in this case and protest the classification. The sufficiency of the proof contained in said exhibit to establish the American manufacturer's right to appear herein has not been challenged by the Government or the party in interest in the record or in the briefs filed in this case. In the opinion of the court, the plaintiff-manufacturer has satisfactorily shown that it has met the prerequisite conditions of section 516(b) of the tariff act, supra, applicable to this case, and that said manufacturer is entitled to be heard as the plaintiff in this proceeding.

It also appears from the great preponderance of the evidence in this case that the plaintiff is a manufacturer, producer, or wholesaler of merchandise of the class or kind of the imported cashmere goat hair here involved.

The only issue in this case then is whether the imported material is properly dutiable under paragraph 1105(a) of the tariff act, as modified, supra, at the applicable rate as "Noils, not carbonized," as classified, or whether the importations should be assessed for duty under paragraph 1106 of the act, as modified, supra,

at the rate of 27¾ cents per pound, plus 6¼ per centum ad valorem, as "hair * * * advanced * * * beyond the washed or scoured condition * * * but not further advanced than roving," as claimed.

The plaintiff introduced in evidence 12 exhibits and the defendant 3. Plaintiff's collective exhibit 1 has already been considered. Plaintiff's exhibits 2 and 3 are admittedly representative of the imported cashmere hair; exhibits 4 and 5 consist of samples withdrawn from exhibits 2 and 3, which were subjected to laboratory tests; illustrative exhibits 6 and 7 were shown to be illustrative of cashmere goat fleeces in the grease as removed from the live animals; illustrative exhibits 8 and 9 represent dehaired cashmere goat fibers produced by the American manufacturer; illustrative exhibits 10 and 11 are admittedly cashmere noils; and plaintiff's collective exhibit 12 consists of photographs of fiber length diagrams of plaintiff's exhibits 2, 3, 4, and 5, and of plaintiff's illustrative exhibits 10 and 11 (R.194). Defendant's collective exhibit A consists of certain letters exchanged between the plaintiff manufacturer and one, J. J. O'Donnell, the importer of the involved merchandise; defendant's collective exhibit C consists of a sample of cashmere top allegedly produced by J. F. Mueller, Inc., the exporter of the involved merchandise; and illustrative exhibits D and E are claimed to be illustrations of cashmere tops.

The plaintiff called eight witnesses, all of whom had had extensive experience in the handling, testing, manufacture, and sale of cashmere goat fibers. Some of these witnesses are outstanding authorities in the analysis and testing of cashmere hair. The defendant called two witnesses, J. J. O'Donnell, the importer of the merchandise now under inquiry, and one, Gregory Shlomm, a well qualified witness, who is president of Amicale Trading Co., an importer, processor, and seller of fibers, including cashmere products, for the knitting and weaving industry.

The evidence shows with no appreciable conflict that the starting material for the production of cashmere goat hair represented by plaintiff's exhibits 2 and 3 is cashmere fleeces in the grease (illustrated by plaintiff's exhibits 6 and 7), which, after scouring and washing, are subjected to a process known as dehairing. The materials and processes involved in the production of cashmere goat hair merchandise are described in detail in plaintiff's evidence.

Dr. Samuel J. Golub, plaintiff's first witness, received a master's degree from the University of Massachusetts and later a doctorate from Harvard in the field of biology (R.13). He is a member of several textile societies including The Fiber Society, American Association of Textile Technologists, and the American Society for Testing and Materials. In the latter society, he is the chairman of the group on cashmere. (R.14).

Dr. Golub, after stating that plaintiff's exhibits 4 and 5 which represent samples taken from plaintiff's exhibits 2 and 3 were submitted to him for laboratory tests, testified that, as a result of the tests, he determined that the fiber was hair of the cashmere goat which had been dehaired and prepared for spinning into yarn (R.20). In explaining what he meant by "dehaired," the witness stated:

A. The cashmere goat is a rather unique animal, in that it has a double fleece. It has a fleece consisting of very fine fibers, and a rather separate outer layer of very coarse fibers which are undesirable in the textile trade. It is in the preparation of the cashmere fiber for commerce the valuable down fiber is separated from the coarse fiber by some technique so that you have the fine down fiber left. This is called dehairing. [R.20.]

Dr. Golub stated that he found a very low percentage by weight of coarse guard hairs in exhibits 4 and 5 and a high percentage of such guard hair in the fleeces in the grease (exhibits 6 and 7). In the opinion of the witness, plaintiff's collective exhibits 2 and 3 were similar in quality to exhibits 8 and 9 and were com-

mercially interchangeable as cashmere hair (R.30). The witness further testified as follows:

Q. Now, as a result of your experience, Dr. Golub, would you say that Plaintiff's Exhibits 4 and 5, to which you have made tests, and Plaintiff's Exhibits 2 and 3, the larger samples of the same thing, are wastes of the hair of the Cashmere goat?—A. Oh, no. This is the desirable product. By no stretch of the imagination would I call it the waste. (R.31.)

The next witness called by the plaintiff was Mr. Orville W. Forte, Jr., who heads the division of the plaintiff company dealing primarily with camel and cashmere hair. The record discloses that he has had extensive experience in buying and selling cashmere fabrics. It further appears that his company markets more than half of the total dehaired cashmere sold in the United States. Mr. Forte identified plaintiff's illustrative exhibits 6 and 7 as cashmere goat fleeces in the grease, and plaintiff's illustrative exhibits 8 and 9 as products derived from the dehairing process to which goat fleeces such as exhibits 6 and 7 were subjected by his company. The witness stated that plaintiff's collective exhibits 2 and 3 are commercially interchangeable with and are the same type product as the dehaired products produced by his company as represented by plaintiff's exhibits 8 and 9 (R.40–41). He further stated that the dehaired cashmeres represented by plaintiff's illustrative exhibits 8 and 9 are ready for spinning, and have not been advanced as far as "roving" (R.44). Mr. Forte also stated that the scouring and washing process to which the fleeces were subjected resulted in the removal of dirt and other waste which were valueless and that the coarse guard hair removed through the dehairing had but little value.

Robert A. Fairbairn, the third witness for the plaintiff, is vice president and director of Fairbairn, Inc. He has the responsibility of developing special equipment for use by his company which operates two plants for the processing of cashmere goat fleeces. Concerning the operations of the company's plants, the witness testified that the principal operation of his company is an overall processing of cashmere for the purpose of dehairing it. He stated that the merchandise represented by plaintiff's illustrative exhibits 6 and 7 were in the condition in which they were received at his plant for processing. In his opinion, plaintiff's illustrative exhibits 8 and 9 were dehaired cashmere (R.74). Concerning dehairing of cashmere goat fleeces Mr. Fairbairn testified as follows:

A. Well, cashmere in the grease has a number of impurities in it; grease, dirt, dandruff, and primarily guard hair. It first has to be mechanically cleaned, and then scoured, and then it's ready to be put into a process known as a dehairing process, where the guard hair is extracted from the down fiber by mechanical means * * *.

* * * * * *

A. In general, the physical action used is one of centrifugal separation, whereby the down fiber is retained in the machine, and the guard hair is removed.

In his opinion, the fibers in plaintiff's illustrative exhibits 2 and 3 are interchangeable with the dehaired cashmere of similar grade and color produced by his company. Mr. Fairbairn also testified that, in his plant, the guard hairs are kept separately as they are removed and then sold for different end uses, depending on their cleanliness and color. He stated that they are just another waste product.

Arthur I. Darman, called by the plaintiff, is the head of the specialty fiber department of the American Silk Spinning Co., a dealer in specialty fibers including cashmere. His experience in the trade began about 50 years ago and he had had continuous experience in the industry since that period. He testified that his company purchased cashmere fleeces in the grease, such as plaintiff's exhibits 6 and 7, and then dehaired them, in which

process the guard hairs are removed, together with such impurities as may be present (R.99). This witness further testified as to the value per pound of cashmere hair in various states of cleanliness and preparation. He described the dehairing process to which his company subjected the raw fleeces and stated that no comb was used in the dehairing process employed by his company. As had the previous witness for the plaintiff, Mr. Darman testified that plaintiff's collective exhibits 2 and 3 were not waste of the hair of the Cashmere goat (R.106).

Eric Ullman, president of Ullman Fabrics, a manufacturer of special fabrics, primarily cashmere, camel hair, vicuna, and other special fabrics, testified that he had purchased dehaired cashmere from J. F. Mueller Co., the exporter in this case, and that the merchandise purchased by him was in the condition of plaintiff's exhibits 2 and 3. He further stated that the materials in the condition of plaintiff's illustrative exhibits 2 and 3 and the cashmere purchased by him from the Mueller company were interchangeable, so much so that he had mixed lots of them together. In his opinion, plaintiff's exhibits 2 and 3 are "the desired, the sought-after product, not the waste" (R.113).

Dr. Kurt J. Winter, also called to testify by the plaintiff, stated that he had received a Ph.D. degree from the University of Vienna in Chemistry about 1928, and thereafter had been employed for 5 years in buying "wool cashmere." Since 1959, he has been a consultant in the textile industry. He stated that products such as plaintiff's exhibits 2 and 3 and illustrative exhibits 8 and 9 are ready to be spun into yarn. This witness was also of the opinion that plaintiff's exhibits 2 and 3 and "dehaired cashmere of similar type and quality" were not waste of the hair of the Cashmere goat (R.127–129).

The defendant and the party in interest called as their first witness Jeremiah J. O'Donnell who owns J. F. Mueller, Inc., exporter of the involved merchandise, and who also heads J. J. O'Donnell Woolens, Inc., the importer and party in interest. Mr. O'Donnell had been in the woolen trade for many years. His experience with cashmere fibers, however, covered a period of slightly over 3 years, or from the time he acquired ownership of J. F. Mueller & Co. Ltd., of Switzerland. The testimony of this witness is confusing and unsatisfactory. At the outset, he was asked:

Q. Has the imported merchandise, as illustrated by plaintiff's Exhibits 2 and 3, been combed?—A. Every pound. [R.148.]

Then, after recognizing plaintiff's illustrative exhibits 6 and 7 as raw fleeces in the grease, he testified as follows:

Q. You testified, I believe, that the raw stock before it was dehaired, came to your plant in Switzerland after it had been scoured; is that right?—A. That is right, sir.

Q. And then you removed the greater proportion of the long stiff guard hair; is that right?—A. We dehaired it, that's right. And the dehairing took most of the guard hair out of it, that's right.

Q. And this was done without the use of any combs?—A. I don't know. I can't answer that. That is a trade secret.

Q. Did you utilize carding machines?—A. Again, that is a trade secret.

Q. Now, didn't you testify yesterday that you produced dehaired cashmere carding?—A. Oh, yes, sir. [R. 166.]

Later, the witness made the following answer:

Q. Did you mean to give the impression that you did not know how your dehairing process worked, or that you did not want to disclose the process?—A. Well, I truthfully couldn't describe our dehairing process, because I haven't been that curious. It would require tearing the machine apart, more or less, and if I did see them, I doubt that I would understand them. [R.167.]

Mr. O'Donnell testified, at least by implication, that plaintiff's illustrative exhibits 8 and 9 are made up of fibers which are longer than the goat hair which he described as noils.

Q. I show you Plaintiff's illustrative Exhibits 8 and 9. Is that a condition of your dehaired cashmere when you start the combing operation?

\* \* \* \* \* \*

A. This looks like stock that has been offered to us before by Forte, and which we have purchased and blended with our noils, because we don't use our noils alone. [R.154]

Mr. O'Donnell admitted that plaintiff's illustrative exhibits 6 and 7 were representative of cashmere in the grease (R. 155). From Mr. O'Donnell's testimony it appears that the imported material is not a waste. While he claimed it to be a noil, his testimony has very little weight when balanced against the testimony of the plaintiff's witnesses to the effect that the material does not consist of noils.

The defendant's witness Shlomm, while well qualified to testify concerning cashmeres, gave no testimony whatever concerning the exhibits before the court.

Dr. Werner Von Bergen, called by plaintiff in rebuttal, is, it appears to the court, the greatest authority on cashmere goat fiber in the United States. He was graduated from a Swiss college as a chemist and began working for a Swiss woolen company in 1919. In 1926 he joined the Forstman Woolen Co., where he served as a chemist and later as director of research. His responsibilities included the control of raw materials purchased by the company, control and improvement of manufacturing processes, and the control and testing of the finished fabric sold to the consumers. In the 1920's he began an intensive study of cashmere fibers, observing them as they were processed through the scouring, carding, combing, spinning, and weaving stages. Subsequently, he was employed by the Federal Trade Commission and the District Attorney of New York in investigating labeling practices covering cashmere production, in which connection he examined hundreds of samples to determine the cashmere content. He had served the United States Department of Agriculture as a member of the Wool Advisory Board for 10 years and at the time of trial was consultant to that agency. Dr. Von Bergen has also published over 60 different papers on wool and hair fibers and is the author of the "American Wool Handbook," an authoritative text book on the subject. This witness, who stated that he had been familiar with material such as that contained in plaintiff's illustrative exhibits 2 and 3 since 1926, further testified that the latter exhibits are not "noils" nor are they waste of the hair of the Cashmere goat, but are "a precious material." Dr. Von Bergen stated that he was one of the originators of the method of testing fibers by fiber length diagrams as illustrated in plaintiff's collective exhibit 12, which method was "a routine test at the Forstman & Company Laboratory." He then testified as follows:

Q. After looking at Plaintiff's Collective Exhibit 12, does this give you information as to the nature of the fibers contained in Exhibits 2 and 3? —A. Yes.

Q. And what information does it convey to you?—A. The information shows that this exhibit, the staple diagram made from 2 and 3, is assuredly not characteristic of a commercial noil. A commercial noil generally is much wilder, it contains vegetable matter, it contains naps, short bunches of fibers. It is very difficult to arrange, generally, in a parallel fashion.

Q. Such as the samples were arranged for those photographs?—A. Yes, below. [R.208.]

Dr. Von Bergen stated that the fibers contained in plaintiff's illustrative exhibits 2 and 3 can be spun into a commercial yarn without the addition of any other fibers and that in the photograph marked as noils in plaintiff's collective exhibit 12 "You would have difficulty in producing a fine yarn" but "would have

to add some longer fiber in this short material" (R.209). The photographs of the staples labeled "noils" in plaintiff's collective exhibit 12 are typical and similar in appearance to wool French noils (R.209). The witness identified plaintiff's illustrative exhibits 6 and 7 as the "raw product" as it generally comes into the country and that it is cashmere in the grease, which is not obtained generally by shearing but is "combed out from the animal hard" (R.210). Although cross-examined at length, Dr. Von Bergen held to his position that the imported merchandise is not noils. He stated that noils are produced only as a by-product of a combing process.

The preponderance of the evidence in this case establishes the following essential facts:

1. That the goat hair represented by plaintiff's exhibits 2, 3, 8, and 9 is definitely not a waste;

2. That the starting material from which exhibits 2, 3, 8, and 9 were derived is goat fleeces in the grease as removed from the live animal as illustrated by plaintiff's illustrative exhibits 6 and 7;

3. That the goat hair represented by plaintiff's exhibits 2 and 3 and that represented by exhibits 8 and 9 are commercially interchangeable;

4. That the goat hair fibers represented by exhibits 2 and 3 as well as by exhibits 8 and 9 had been scoured and dehaired but had not been advanced to a condition further advanced than roving;

5. That the purpose of the dehairing process is to remove from the scoured goat fleeces the external stiff guard hairs which are not wanted or suitable for making yarn to be used in the manufacture of cashmere materials;

6. That the guard hair removed from fleeces has but little value and is considered by the trade a waste; that said guard hairs are not cashmere tops;

7. That the fibers represented by exhibits 2, 3, 8, and 9 are not noils;

8. That noils are the product of a combing process to which dehaired fibers are subjected to obtain cashmere tops and that noils are too short to be fabricated separately into yarn but must be blended or mixed with longer fibers before they can be used in the knitting industry; that the material contained in exhibits 2, 3, 8, and 9, did not come from a combing process applied to dehaired cashmere goat fibers;

9. That the fibers represented by exhibits 2, 3, 8, and 9 are sufficiently long to be woven separately into yarn and are thus woven in the industry;

10. That nothing had been removed from the material represented by exhibits 6 and 7 (cashmere goat fleeces in the grease in the same condition as it was removed from the live animals) except the grease, dirt, and other refuse and the coarse guard hairs. There had been no further processing after the dehairing process.

Specifically, Dr. Von Bergen's testimony was definite on the point that the materials represented by exhibits 2, 3, 8, and 9 do not consist of noils. As heretofore indicated, he was corroborated on this point by some of plaintiff's other witnesses. Dr. Golub and Dr. Von Bergen were in agreement that the linear measurements of the goat hair in plaintiff's exhibits 2, 3, 4, and 5, and plaintiff's illustrative exhibits 8 and 9 were substantially the same as the measurement of hairs removed from the soft undercoat of the raw fleeces. Both witnesses also testified that plaintiff's illustrative exhibits 10 and 11 consist of "noils," goat hair too short to be woven into yarn except by blending with longer fibers.

There is no controversy really concerning the meaning of the term "noil." Numerous quotations contained in the brief of *amicus curiae* substantiate the claim that noils are the shorter fibers of wool or hair removed in the combing process.

■ The plaintiff contends that paragraph 1105(a), as modified by the General Agreement on Tariffs and Trade, T.D. 51802, is restricted in its applica-

tion to "wool and hair wastes"; that in any event paragraph 1105(a) includes only sheep's wool and does not cover wastes of the hair of the Cashmere goat. An analysis of the statutes involved and of the legislative history of the paragraph seem to bear out this construction. Clearly, "Wastes of the hair of the * * * Cashmere goat" are not classifiable under paragraph 1105(a) since that merchandise is specifically included within the provisions of paragraph 1105(b). Paragraph 1105(a) was, in our opinion, intended by Congress to cover only wastes of sheep's wool. In the 1929 Summary of Tariff Information, at page 1688, compiled for the guidance of The Ways and Means Committee of the United States House of Representatives (Tariff Act of 1922), it is stated: "Paragraph 1105 covers the materials which are referred to in paragraph 1103 as wool waste and wool-waste material."

After the enactment of the Tariff Act of 1930, i. e., on December 13, 1930, the United States Commissioner of Customs ruled that paragraph 1105 related "exclusively to waste or by-products" and that wool noils intentionally made were classifiable under paragraph 1102, T.D. 44458. In paragraph 1105(a) and (b), as modified by T.D. 51802, noils both carbonized and uncarbonized are listed under the heading of "Wool and hair wastes."

As hereinbefore pointed out, the evidence in this case clearly establishes that the merchandise is not a waste. If the imported fibers could, under the evidence, be held to be waste, still they definitely are not noils. They are not, therefore, properly classifiable either as waste or noils under paragraph 1105(a).

▪ In this case, the Government and the party in interest start out upon the assumption that the imported material consists of noils. They rely upon the fact that the party in interest imported the material under the name of noils and sold it under such labeling and that a manufacturer by the name of Dawson sold similar material under the name of "noils." However, there is no re-

liance upon commercial designation. Furthermore, there can be no validity in the argument that the imported material, *eo nomine*, is classifiable under section 1105(a), as modified, since the evidence actually shows that the material in question is not a noil. The fact that the importer, the party in interest, sought to bring the material in under the low rate provided for under 1105(a), supra, as modified, and referred to the imported material as noils, is, under the facts of this case, entitled to little weight in the opinion of the court.

In support of the classification here made, counsel for the Government, party in interest, and *amicus curiae* place great reliance upon the holding of the court in the cases of Chas. F. Murphy & Co. v. United States, T.D. 12680, G.A. 1329, decided April 4, 1892; and S. Lobsitz v. United States, T.D. 15232, G.A. 2725, decided August 2, 1894, affirmed in Lobsitz v. United States, C.C., 75 F. 834, decided May 22, 1896. These old cases were decided under the Tariff Acts of 1890 and 1892, which differed widely from the Tariff Act of 1930, as modified. Furthermore, in those cases it was conceded that the merchandise involved consisted of noils.

In the *Murphy* case, supra, the merchandise consisted of certain alpaca noils which were produced from the fleeces of the alpaca by scouring, oiling, and combing the same, "by which process the long hair or tops are removed and the short hair or furry portion is combed into noils." No such facts are here presented.

In the case of S. Lobsitz v. United States, T.D. 15232, G.A. 2725, decided August 2, 1894, Chinese camel's hair noils were held to be noils within the meaning of predecessor paragraph 388 of the Tariff Act of 1890. The then Board of General Appraisers in its decision, pages 594–595, stated:

In the manufacture of worsted goods from combing wool the long fibers known as tops are combed from the wool for that purpose, and the short fibers separated therefrom

are known as noils. As the noils are not suitable for use by the manufacturer of worsted cloths, they are waste in so far as relates to his business, but are not such by any means to the manufacturer of woolen cloths, although their value may be less than the wool before combing. Before arriving at this stage or process of manufacture such wools have been washed or scoured.

The foregoing case is entirely different than the instant case. Furthermore, we do not think the construction given in those old cases to the Tariff Acts of 1890 and 1892 is applicable to the Tariff Act of 1930, as modified. The modification in duties with respect to paragraph 1105 of the Tariff Act of 1930, effected by the General Agreement on Tariffs and Trade, T.D. 51802, was clearly restricted to the "Wool and hair wastes" covered thereby. Here, the imported fibers are not a waste.

In the briefs of the Government and *amicus curiae,* a number of cases involving A. H. Ringk & Co. as plaintiff are cited in support of the contention that the merchandise at bar is properly classifiable under paragraph 1105(a) of the Tariff Act of 1930, as modified. These cases were decided under certain predecessor paragraphs of the tariff act. In our opinion, the holding of the court in these cases fails to advance the claims here made in support of the collector's classification. While these cases hold that certain cashmere noils were classifiable under the provision for "noils" in the relevant paragraphs of the tariff act there involved, it appears from a reading of the cited cases that the involved merchandise was admittedly and in fact cashmere noils, as stated, for example, in the case of A. H. Ringk & Co. v. United States, 29 Treas.Dec. 141, Abstract 38198, decided August 2, 1915. In the latter case, the merchandise, "admittedly cashmere noils," was classified under paragraph 305 of the Tariff Act of 1913, covering "hair of the Angora goat, alpaca, and other like animals, and all hair on the skin of such animals."

The merchandise was claimed free of duty under paragraph 651 of the relevant tariff act. In holding the merchandise there involved free of duty as "wool waste," the court in the *Ringk* case, Abstract 38198, stated:

If cashmere noils are waste, then this case is ruled by Judge Hay's finding in the case of Ringk & Co., G.A. 7649 (T.D. 34997), where he held that:

Where Congress has with such particularity provided a duty upon the hair of the Angora goat and various articles manufactured therefrom, as has been done in paragraphs 305, 306, 307, 308, and 309, *all products* of the *hair* of the Angora goat *not included in those paragraphs* come, we think, under the general provision for wool.

In affirming Judge Hay's finding, the United States Court of Customs Appeals in Crimmins & Pierce v. United States (6 Ct.Cust.Appls., —; T.D. 35392) *held that noils were conclusively waste* under the express language of paragraph 651. [Italics supplied.]

In the case of P. Silverman & Son v. United States, 32 CCPA 99, 106, C.A.D. 292, and other cases also cited by the Government in its brief, the courts have held to the effect that noils are obtained in the combing process, by separating the short fibers from the long fibers. With this determination we are, of course, in agreement. However, as heretofore pointed out, the record in the case at bar establishes, in our opinion, that the imported fibers are not in fact "noils." In our opinion, the imported merchandise is properly classifiable under paragraph 1106 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, supplemented by T.D. 52739, under the provisions therein for " * * * hair of the kinds provided for in schedule 11, Tariff Act of 1930, if carbonized, or advanced in any manner or by any process of manufacture beyond the

washed or scoured condition, including tops, but not further advanced than roving: Other than carbonized only" at the rate of 27¾ cents per pound and 6¼ per centum ad valorem, as claimed, and we so hold. The protest is sustained.

Judgment will issue accordingly.

NICHOLS, J., not participating.